**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN N DIVISION**

Jeffrey A. Fletcher,                              :                    Case No. 5:09 CV 1017

      Petitioner,                            :

v.                                                :           **MAGISTRATE'S REPORT
                                                              AND RECOMMENDATION**

Maggie Beightler, Warden,                         :

      Respondent.                           :

This case was filed pursuant to 28 U.S.C. § 2254 and  referred to the undersigned Magistrate pursuant to the United States District Court for the Northern District of Ohio Local Rule 72.2.  Pending are Petitioner's Petition for Writ of Habeas Corpus (Docket No. 1), Respondent's Return (Docket No. 8), Petitioner's Traverse (Docket No. 13) and Petitioner's Motion for Reconsideration (Docket No. 18).  For the reasons that follow, the Magistrate recommends that the Court deny the Petition for Writ of Habeas Corpus and the Motion for Reconsideration.

### I. FACTUAL BACKGROUND.

A habeas court must presume the state court's factual findings are correct.  *Thompson v. Bell,* 580 F.3d 423, 433 (6th Cir. 2009) (*citing* 28 U.S.C. § 2254(e)(1)).  In *State of Ohio v. Jeffrey A. Fletcher*, the Court of Appeals for the Ninth District, Summit County, Ohio, made the following factual findings.

{¶ 15} The victim, Linda Weaver, testified that she and Fletcher had been living together for two to three years in his home at the time of these incidents on August 30, 2006. Although she and Fletcher had had a romantic relationship, she testified that the two were not getting along and had been sleeping apart in Fletcher's home for the six months preceding these incidents. Ms. Weaver continued to testify as follows.

{¶ 16} Ms. Weaver got up at 5:00 a.m. on August 30, 2006, because she had to cover a shift for a co-worker. She passed Fletcher, who was sleeping on the couch in the living room, on her way to the kitchen to make coffee. In order to use the coffeepot, she moved a pizza box and threw it on the floor beside the full trash can. At the sound of that, Fletcher jumped up from the couch and ran toward the kitchen and began chastising her for her behavior. Fletcher told Ms. Weaver that she could no longer stay in his home unless she started paying rent. Ms. Weaver then asked Fletcher to repay her $300 she had lent him. When he told her that she would never see that money, Ms. Weaver walked to the stereo in the living room, began playing with the buttons on the stereo, and commented that she was sure she could get $300 for the stereo. Ms. Weaver admitted that she was trying to irritate Fletcher because she had not had any coffee yet that morning and she needed to get to work.

{¶ 17} Ms. Weaver testified that Fletcher then grabbed her by the chin and head and "snapped" her neck, which made an audible "pop" and caused her "an incredible amount of pain." She testified that Fletcher's actions caused her body to spin around and hit a DVD/CD tower near the stereo. She testified that as she began falling down, Fletcher hit her with his forearms in her head and shoulders. Ms. Weaver testified that Fletcher looked at the tower on the floor and began to yell at her for knocking it over. She testified that he then threatened to destroy her laptop computer. Fletcher began to move in the direction of her bedroom, watching her as he did so. Ms. Weaver testified that she decided not to try to stop him because past violent experiences with him made her think that her interference would only escalate the situation.

{¶ 18} Ms. Weaver testified that she pulled herself to her feet and turned towards the door, intending to let Fletcher do whatever he was going to do to her computer. She testified that Fletcher approached her and twisted her neck a second time, causing her to again fall to the floor. She testified that she picked herself up, turned and fell onto the couch. She testified that there was a .45 caliber handgun nearby on the coffee table. She testified that she picked up the gun and began to wave it at Fletcher so that he would not continue to hurt her.

{¶ 19} Ms. Weaver testified that Fletcher ran towards her and began twisting the gun out of her hands. She ended up lying on the couch with her feet on the ground as he continued to twist the gun from her grip. Ms. Weaver testified that Fletcher wrestled the gun from her hands, stepped back, and fiddled with the gun as though he was trying to turn the safety off. She testified that Fletcher put the gun to her chest, stepped back and "fiddle[d]" with the gun, put the gun to her chest again, then stepped back again. Ms. Weaver testified that, after that back and forth, Fletcher discharged the gun as he stood back from her. She testified that she immediately sat up as the bullet entered her. She testified that Fletcher picked up her shirt in the back and told her to get up. She testified that she stumbled as she tried to stand, and she fell into the couch.

{¶ 20} Ms. Weaver identified the .45 caliber handgun taken from Fletcher's home as the weapon he used to shoot her. She testified that Fletcher kept several high-powered firearms in his home and that he "religiously keeps the safeties on all his guns[.]" She testified that she did not turn off the safety mechanism on the .45 at any time.

{¶ 21} Ms. Weaver testified that Fletcher placed the gun on the back of the couch, then picked her up and took her outside to his truck, where he dropped her in the dirt. She testified that she was unable to get up despite Fletcher's orders that she do so. She testified that he picked her up and put her in the truck and drove her to the hospital. Ms. Weaver testified that when they arrived at the hospital, Fletcher yelled, "gunshot victim." Hospital personnel pulled her out of the truck and took her into the hospital. She testified that Fletcher did not go inside the hospital with her.

{¶ 22} Ms. Weaver testified that Fletcher visited her quite often during her week-long hospital stay. She testified that he threatened her repeatedly and told her to tell people that the shooting was an accident. She testified that she initially told the police that she was accidentally shot during a struggle, but after she had been moved to another room where she felt safe, she told the police that Fletcher's discharge of the gun was not an accident. Ms. Weaver testified that Fletcher admitted to her during one of his threatening conversations, "I had to take the safety off the gun in order to shoot you."

2

{¶ 23} Detective Anthony Sutton of the Akron Police Department ("APD") testified that on August 30, 2006, he responded to Akron General Medical Center on a call regarding a victim with a gunshot wound.  He testified that hospital personnel informed him that the victim had been dropped off by Fletcher.  Detective Sutton testified that he questioned Fletcher when Fletcher returned to the hospital.

{¶ 24} Detective Sutton testified that Fletcher told him that he was on his front porch when he heard a gunshot.  He testified that Fletcher told him the following.  When he ran back into the house, he saw Ms. Weaver sitting on the couch.  He scanned the room for bullet holes, then lifted Ms. Weaver's shirt and saw a blue bruise on her lower back.  Fletcher picked her up and rushed her to the hospital.  Fletcher then returned home to secure his hands and bring in his dogs.  Detective Sutton testified that Fletcher's demeanor changed from "aggressive" to tearful and back during their encounter, depending on whether or not Fletcher thought the police had spoken with the victim.  The detective testified that Fletcher asked him whether he had spoken with Ms. Weaver and whether she was able to talk.  Detective Sutton testified that Fletcher asked repeatedly if he could wash his hands.  Fletcher told him that his hands were dirty from playing with his dogs and putting them back inside his house.  Fletcher was permitted to wash his hands.

{¶ 25} Detective Sutton testified that Fletcher told him that Ms. Weaver had tried to kill herself.  The detective testified that Fletcher never mentioned a struggle.  He testified that Fletcher told him that Ms. Weaver would not have accidentally shot herself because there was no reason to play with weapons which were accessible throughout the house.

{¶ 26} Finally, Detective Sutton testified that he stopped Fletcher several months later during a traffic stop.  He testified that Fletcher did not recognize him at that time.  When the detective commented about the pending trial, Fletcher told him that he was planning to plead self-defense.

{¶ 27} Detective Michael Shaeffer of the APD testified that he too responded on August 30, 2006, to the hospital regarding a gunshot victim.  While at the hospital, Detective Shaeffer performed a gunshot residue test on the victim, while Detective Hudnall and Sergeant McLeod performed one on Fletcher.  He testified that he questioned Fletcher, who first told him a story similar to the one he told Detective Sutton.  The detective testified, however, that Fletcher told him that the shooting had to have been an accident because Ms. Weaver "wouldn't do that to herself."  The detective testified that he asked Fletcher to tell him again what happened.  He testified that this time Fletcher told him that he heard a gunshot as he was walking out from the basement, not the front porch.  The detective testified that, while Fletcher did not mention the gun in their first discussion, in the second discussion Fletcher said that he saw the gun in Ms. Weaver's right hand and he took it and moved it to the coffee table.  The detective testified that he had a third discussion with Fletcher about ten minutes later, in which Fletcher changed his statement and said that he and Ms. Weaver were arguing about money, that she grabbed the gun, he tried to take it from her and it went off.  The detective testified that Fletcher refused to elaborate further.

{¶ 28} Detective Shaeffer testified that he later accompanied the Crime Scene Unit to Fletcher's house to process the scene.  He testified that Fletcher let the police into his home after he took a couple minutes to secure his dogs in a back room.  The detective testified that Fletcher told the police at the scene that his dogs had knocked over the DVD/CD tower as they were trying to reach a stuffed animal.  Detective Shaeffer testified that there was a stuffed animal nearby but that it did not appear wet as though played with by dogs.  The detective testified that there was a Hi-Point .45 handgun, with the magazine removed and placed on top, on the headrest of the couch.

{¶ 29} Detective Shaeffer testified that he later questioned Ms. Weaver, as well as the father of Ms. Weaver's children with whom Ms. Weaver had reconciled.  The father told the detective that Ms. Weaver was a born-again Christian who would never attempt suicide.  The detective testified that Ms. Weaver was intubated during their discussion, but she wrote that she did not shoot herself.  She wrote "accident" and "struggle."  Detective Shaeffer testified that, in his experience, he has never seen a self-inflicted accidental shooting where the victim was shot in the torso, as Ms. Weaver was.

{¶ 30} Detective Shaeffer testified that he questioned Ms. Weaver two additional times.  He testified that in those interviews the victim changed her statement and reported that she and Fletcher struggled for the gun and that Fletcher took it away from her and shot her.  The detective testified that Ms. Weaver told him that she was sure that Fletcher purposely shot her because she had not taken the safety off the gun, and he had to do so in order to shoot her.  The detective testified that Ms. Weaver told him the incident started as she and Fletcher were arguing about money, and that the argument turned

3

physical as Fletcher grabbed her and "snapped" her neck. Ms. Weaver told the detective that she grabbed the gun, planning to fire it at the fish tank to distract Fletcher or fire it elsewhere so the neighbors would hear it and Fletcher would stop attacking her.

{¶ 31} Detective Shaeffer testified that Ms. Weaver told him that Fletcher came to visit her in the hospital and that she felt threatened by him.  The detective testified that Fletcher was irritating hospital staff by his insistence on seeing Ms. Weaver.  The detective told the staff that Fletcher should not have visitation rights with the victim because the police had not ruled him out as a suspect.

{¶ 32} Finally, Detective Shaeffer testified that, based on his knowledge and belief, it would have been impossible for the victim to have shot herself in the manner in which she was shot.  He further opined that, based on the angle that the bullet entered her body, the gun would have been discharged by "someone standing at an angle towards her."

{¶ 33} Officer Kevin Davis of the APD testified that he is the primary instructor for the APD's use-of-force training.  The trial court qualified him as an expert in the use of force, weapons and defensive tactics.  Officer Davis testified that he reviewed all the evidence in this case, including the .45 caliber firearm used to shoot Ms. Weaver.  He testified that the .45 has a safety mechanism which prevents firing even when the trigger is pulled when the pistol is on safe.  He testified that the gun also has a magazine disconnect which prevents firing unless the magazine is in place.

{¶ 34} Officer Davis testified that it is easy to track the trajectory of a .45 caliber round.  He testified that he performed tests with a similar weapon, firing at a tee shirt from different ranges.  He explained that a gunshot blast leaves stippling, or a pattern of residue, on a victim's skin and clothing.  Based on his experience and investigation, Officer Davis opined that it would have been very difficult for Ms. Weaver to have caused a self-inflicted wound where the bullet entered the right side of her chest and traveled at an angle downwards, lodging in her lower right torso.

{¶ 35} Officer Davis testified that the firearm used to shoot Ms. Weaver is a large, 2-pound pistol.  He testified that it would be harder for a smaller person, especially a female, to fire the gun at all (Ms. Weaver testified that she is approximately 5'7" and 113 pounds.).  Further, based on the residue tests he performed with a similar weapon, he opined that the lack of residue on the victim's clothing indicated that the gun muzzle was in excess of one foot from her body when she was shot.  In fact, he testified that there was no apparent muzzle blast on Ms. Weaver's blouse.  Officer Davis testified that it is easier to disarm a person holding a larger weapon.  He further testified that, while a gun may discharge during a struggle over the weapon, in the course of disarming, the muzzle would necessarily be aimed upwards rather than downwards.  In addition, he testified that there was no evidence that Ms. Weaver suffered any injury to her trigger finger.  He testified that he would expect a serious injury, including fracture, to the trigger finger as someone else attempts to disarm another.

{¶ 36} Officer Davis testified as to several opinions within his capacity as an expert.  He opined that there was no indication that the .45 caliber pistol used to shoot Ms. Weaver malfunctioned in any way.  He opined that it was highly probable that Ms. Weaver was shot after she was disarmed and from a distance in excess of one foot.  In conclusion, he opined that it was highly unlikely that Ms. Weaver's wound was self-inflicted.

{¶ 37} The parties stipulated that Martin Lewis of the Ohio Attorney General's Office, Bureau of Criminal Identification and Investigation ("BCI") is an expert in forensic science, specifically trace evidence.  Mr. Lewis testified that he analyzed the gunshot residue tests submitted in this case.  He concluded that there was gunshot residue present on both the right and left hands of both Fletcher and Ms. Weaver.  He testified that there are only three reasons why someone's hands would test positive for gunshot residue, to wit: 1) the person discharged a firearm; 2) the person was in close proximity to a firearm which discharged; or 3) the person came into contact with something covered with gunshot residue, for example, a discharged firearm.  He testified that gunshot residue dissipates within 4-6 hours through normal activity.

{¶ 38} The parties stipulated that Jonathan Gardner of BCI is an expert in the field of firearms and their operability.  He inspected the .45 caliber handgun found at the scene.  He opined that the gun was operable and functioned as designed.  He opined that the fired cartridge casing found at the scene was fired from Fletcher's gun, and the bullet removed from Ms. Weaver was fired from that same weapon.  He testified that there are three primary safeties on Fletcher's gun, to wit: 1) an external thumb safety switch, which blocks the firing pin from firing; 2) a magazine safety which requires insertion of the magazine before the gun will discharge; and 3) an internal disconnect safety which disconnects the firearm if the trigger is not pulled.  Mr. Gardner admitted that the preferred method of conducting a

4

distance test is to test the specific gun and ammunition used, rather than a similar weapon and ammunition.

{¶ 39} Donald Frost of the APD Crime Scene Unit testified that he was called to Fletcher's home on August 30, 2006, to investigate a shooting. He testified that he took photographs of the scene, which were admitted into evidence. He testified that a .45 caliber handgun, with the magazine removed and placed on top, was lying on the back of the couch in the living room. He testified that he "safed" the handgun by removing a live round from the gun's chamber. He further identified a spent casing found between the cushions of the couch.

{¶ 40} Detective Terrence Hudnall, supervisor in the APD's Crimes Against Persons Unit, testified that he spoke with Fletcher at the hospital about the shooting. He testified that Fletcher seemed very nervous, but reluctantly consented to a gunshot residue test. He testified that Fletcher told him that he had handled the firearm but had not fired it. Detective Hudnall further testified that Fletcher told him that he was standing outside on his front porch when he heard a gunshot. He testified that Fletcher said he went inside and saw Ms. Weaver sitting on the couch. Fletcher told him that Ms. Weaver appeared wobbly as she tried to stand, so he had her sit. Fletcher told him he looked around, saw a nearby gun, moved it to either the couch or kitchen, and checked over Ms. Weaver, noticing a dark bruise on her back. Detective Hudnall testified that Fletcher told him he took Ms. Weaver to the hospital and returned home to care for his dogs. The detective testified that Fletcher expressly denied having had any argument with Ms. Weaver.

{¶ 41} Detective Hudnall testified that he accompanied other police officers to the scene to investigate. He testified that Fletcher spent 3-4 minutes securing his dogs before he let the law enforcement officials inside his home. He testified that Fletcher was "jittery" while the police investigated at the scene. Detective Hudnall testified that when he questioned Fletcher about the overturned DVD/CD tower, Fletcher told him the dogs must have knocked it over.

{¶ 42} Mark Lebus, a patient representative at Akron General Medical Center, testified that he was in Ms. Weaver's hospital room once when Fletcher was visiting her. He testified that, as he was asking Ms. Weaver questions to screen her for benefits, Fletcher attempted to answer everything on her behalf. Mr. Lebus testified that the father of Ms. Weaver's children entered the room, and Fletcher became agitated, "stormed out of the room," then returned and yelled at Ms. Weaver to get her possessions from his home. Mr. Lebus testified that Fletcher told Ms. Weaver that if anyone else came to pick up her possessions, "then they would also end up [in the hospital]."

{¶ 43} Dr. Robert Marley testified that he treated Ms. Weaver at Akron General Medical Center for her gunshot wound. He testified that the history of how she obtained the gunshot wound was questionable. He testified that the patient's boyfriend reported Ms. Weaver was handling a gun when it fired and hit her in the right chest. Dr. Marley testified that the bullet entered Ms. Weaver below the right nipple and lodged in her lower right flank. Dr. Marley testified that Ms. Weaver's medical records contain a note by a social worker that Ms. Weaver did not want to see Jeffrey Fletcher, identified as her boyfriend.

{¶ 44} The defendant's father, Sylvester Fletcher, testified on behalf of his son. He testified that Ms. Weaver called his cell phone at some time after the incident and told him that it was a "stupid accident" and her fault. He testified that she asked where Fletcher was and he told her that his son was working. He testified that Ms. Weaver had never before contacted him for any reason, and that he did not know how she got his cell phone number.

{¶ 45} Mr. Fletcher testified that he learned of the incident when his son called him on August 30, 2006, or the next day. He testified that Fletcher told him that Ms. Weaver "got shot" as "they rassled over the gun."

{¶ 46} Jeffrey Fletcher testified in his own defense. He testified that Ms. Weaver moved in with him at his Leighton Avenue, Akron, Ohio, home within six months of their meeting. He testified that they had an intimate romantic relationship for more than two years, but that they later stopped getting along and Ms. Weaver began sleeping in a spare bedroom.

{¶ 47} Fletcher testified regarding the incident as follows. On August 30, 2006, he was sleeping on the couch, when Ms. Weaver came in and said something to him which awakened him. Ms. Weaver went into the kitchen and picked up a Chinese dinner from the counter and threw it on the floor. Fletcher walked into the kitchen and told her not to throw food. Ms. Weaver asked him if he wanted her to leave and he told her just not to throw food around the house. Ms. Weaver asked him for the $300 he owed her and he told her he would get it for her soon. Because Ms. Weaver was not satisfied with this response, she began jerking wires out of the stereo in the living room. As she pulled on the wires, she accidentally knocked over the DVD/CD tower. Fletcher watched as Ms. Weaver tried to lift the amplifier but dropped it because of its weight. Fletcher then walked over to Ms. Weaver and stuck out his arm and pushed her back. As he did so,

5

Ms. Weaver tripped over a stuffed animal lying on the floor.  Ms. Weaver became irate, walked to the couch, picked up a .45 semi-automatic pistol and pointed it at Fletcher.

{¶ 48} Fletcher continued to testify as follows.  Ms. Weaver knew the weapon was loaded because Fletcher had had many discussions with her regarding his firearms.  Fletcher saw Ms. Weaver's trigger finger get "fatter" and he realized she had squeezed the trigger in an attempt to fire the gun.  Realizing he had to act, Fletcher rushed toward Ms. Weaver, grabbed hold of the gun and tried to wrestle it away from Ms. Weaver.  Fletcher pointed the gun upwards. Ms. Weaver fell back on the couch, pulling the gun towards her, and the gun discharged from about a foot away from Ms. Weaver.  Fletcher had one hand on the gun, while Ms. Weaver had both hands on it.  Not thinking Ms. Weaver was hit, Fletcher looked around for a bullet hole, concerned that the gun had been discharged through his house into a neighbor's house.  Not seeing any bullet hole and noticing that Ms. Weaver had fallen over on the couch, Fletcher lifted her shirt and saw a blue bruise on her back.  He placed the gun on the couch but denied removing the magazine.

{¶ 49} Fletcher continued to testify as follows.  Not seeing any blood but believing that something must be wrong with Ms. Weaver, who could not stand, Fletcher carried her to his truck and drove her to the hospital.  At the hospital, Fletcher yelled that he had a gunshot victim.  While hospital personnel attended to Ms. Weaver, Fletcher left to secure the dogs he was certain had run out of the house as he left with Ms. Weaver.  At home, he detached the trailer which was on his truck and he hurried back to the hospital.  At the hospital, law enforcement personnel began to question him about the incident.

{¶ 50} Fletcher admitted that his prior statements to the police did not mirror his current version of the events. He testified that Ms. Weaver told him for the first time on the way to the hospital that she was a felon, and he decided to tell the police the incident was an accident because he did not want to cause her any trouble.  Although he maintained that he concocted different variations of the story to protect Ms. Weaver, he admitted that all versions put her in possession of the firearm.

{¶ 51} Fletcher addressed the alleged threats he made to Ms. Weaver in the hospital.  He testified that he never made any comments about her cheating on him, but he admitted that he told her if anyone else came to pick up her belongings, that person would wind up in the hospital too.

*State v. Fletcher,* 2008 WL 2514058, *3 -10 (2008).

## II. PROCEDURAL BACKGROUND.

### A. INDICTMENTS.

On September 26, 2006, the Jurors of the Grand Jury of Summit County, Ohio, returned an indictment charging:

(1)     Count One:  Felonious assault, a felony of the second degree, in violation of OHIO REV. CODE § § 2903.11(A)(1) and/or 2903.11(A)(2); A firearm specification as to Count One for having a firearm while committing the felonious assault, a violation of OHIO REV. CODE § 2941.145.

(2)     Count Two:  Intimidation of Crime Victim or Witness, a felony of the third degree, in violation of OHIO REV. CODE § 2921.04(B).

(3)     Count Three:  Domestic violence, a misdemeanor of the first degree, in violation of OHIO REV. CODE § 2919.25(A).

(Docket No. 8, Exhibit 1).

This indictment was dismissed without prejudice on April 16, 2007 (Docket No. 8, Exhibit 3).

On May 8, 2007, the Jurors of the Grand Jury for Summit County, Ohio, returned a secret indictment charging:

(1)      Count One:      Felonious Assault with a firearm specification.

(2)      Count Two:      Intimidation of Crime Victim or Witness.

(3)      Count Three:   Domestic Violence.

(Docket No. 8, Exhibit 4).

On October 28, 2002, a jury found Petitioner guilty of the offenses of felonious assault and domestic violence.  The jury found Plaintiff not guilty of the offense of intimidation of a crime victim or witness (Docket No. 8, Exhibits 6, 7 & 8).

**B.      SENTENCING**

On July 26, 2007, Petitioner was committed to the Ohio Department of Rehabilitation and Corrections for an actual three year mandatory sentence for possession of a firearm and for a definite term of three years, which is not a mandatory term, for the punishment of felonious assault and that Petitioner serve six months in the Summit County Jail for punishment of the crime of domestic violence.  The sentences imposed for possession of a firearm and felonious assault were to be served consecutively with each other and the sentence imposed on the domestic violence charge was to be served concurrently with the sentences imposed on the possession of a firearm and felonious assault charges.

(Docket No. 8, Exhibit 9).

**C.      Direct Appeal**.

Petitioner perfected a timely notice of appeal in the Court of Appeals for the Ninth Appellate District[1] (Docket No. 8, Exhibit 10).  On June 25, 2008, the Court of appeals overruled both assignments of error and affirmed the judgment of the trial court (Docket No. 8, Exhibit 14).

**D.      APPEAL OF THE DISTRICT COURT DECISION TO THE OHIO SUPREME COURT.**

On August 11, 2008, Petitioner, represented by counsel, filed a notice of appeal in the Ohio Supreme Court[2] (Docket No. 8, Exhibits 20 & 32).  Chief Justice Moyer denied Petitioner leave to appeal and dismissed the appeal as not having any substantial constitutional question (Docket No. 7, Exhibit 22).

**E.      DIRECT APPEAL TO THE OHIO SUPREME COURT.**

On August 1, 2008, Petitioner, *pro se*, filed a notice of discretionary and claimed right of appeal in the Ohio Supreme Court[3] (Docket No. 8, Exhibits 15 & 31).  Chief Justice Thomas J. Moyer dismissed the appeal as not involving any substantial constitutional question (Docket No. 9, Exhibit 18).

**F.      POST CONVICTION RELIEF**.

On August 28, 2008, Petitioner filed a motion to vacate or set a side judgment pursuant to OHIO REV.

---

[1]      In the subsequently filed appellate brief, Plaintiff asserted two general assignments of error.  First, Petitioner's convictions were based on insufficient evidence as a matter of law.  Second, the trial court erred in allowing other acts evidence without any basis and in failing to instruct the jury about the limited purpose of such evidence.

[2]      Three propositions of law were argued.  First, where the evidence adduced at trial demonstrated a non-fatal shooting that was an accident, there was insufficient evidence to establish that Petitioner had the requisite mental state of knowingly committing the offense.  Second, a trial court erred to the prejudice of the defendant where it admitted other acts evidence at trial without any basis. Third, the court failed to instruct the jury about the limited purpose of such other acts evidence.

[3]      Petitioner's thirteen propositions of law can be addressed as three general claims.  First, his conviction was not based on substantial evidence.  Second, the trial court abused its discretion in admitting other acts evidence.  Third, appellate counsel was ineffective.

CODE § 2953.21[4] (Docket No. 8, Exhibit 25).  An order denying the motion to vacate was entered on September 4, 2009 (Docket No. 8, Exhibits 29 & 33)

On September 17, 2008, Petitioner filed an application to reopen the case under APP. R. 26(B) in the court of appeals[5] (Docket No. 8, Exhibit 23).  The application to reopen was denied on September 23, 2008 (Docket No. 8, Exhibits 24 & 30).  Chief Justice Moyer entered an order on November 17, 2008, denying Petitioner leave to appeal and dismissed the appeal as not having any substantial constitutional question (Docket No. 8, Exhibit 30).

## G.    PETITION FOR WRIT OF HABEAS CORPUS.

Petitioner filed a Petition under Section 2254 on May 4, 2009 (Docket No. 1).  Respondent filed a timely Return followed by Plaintiff's Traverse.  Petitioner sought leave to conduct discovery.  The Magistrate denied such Motion and Petitioner's request for reconsideration by a district court judge was held to be prematurely filed (Docket No. 19).

### III.  FEDERAL COURT JURISDICTION.

Writs of habeas corpus may be granted by the district court within the respective jurisdictions.  *Charley v. Jackson,* 2010 WL 99361, *5 (N. D. Ohio 2010).  Where an application for a writ of habeas corpus is made by a person in custody under the judgment and sentence of a state court of a state which contains two or more federal judicial districts, the application may be filed in the district court for the district wherein such person is in custody or in the district court for the district within which the state court was held which convicted and sentenced him/her and each of such district courts shall have concurrent jurisdiction to entertain the application.

---

[4]

Petitioner acknowledged that the motion was untimely filed.  However, Petitioner argues that but for the constitutional error at trial, no reasonable factfinder would have found him guilty.  He relied upon the miscarriage of justice doctrine and attempted to introduce a written statement by the alleged victim that would exculpate him.

[5]

All of Petitioner's assignments of error assert that appellate counsel was ineffective as his counsel.

*Id.* (*citing* 28 U. S. C § 2241(a) & (d)).  The writ of habeas corpus shall not extend to a prisoner unless he or she is in custody in violation of the Constitution or laws or treaties of the United States.  28 U. S. C. 2241 (c)(3) (Thomson Reuters 2010).

Petitioner was sentenced by a judge of the Summit County, Ohio, Court of Common Pleas.  Petitioner is confined at the Marion Correctional Institution as a result of his convictions.  He is in custody for purposes of habeas jurisdiction.  Petitioner has sufficiently alleged a deprivation of the Sixth Amendment rights guaranteed under the United States Constitution.  Accordingly, this Court has jurisdiction over Petitioner's claims.

### IV. HABEAS CORPUS STANDARD

In determining whether to issue a habeas writ, the standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996) govern the district court's review of a state court decision.  *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007).  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *Id.* (*citing* 28 U.S.C. § 2254(d)).  A state court decision on the merits is contrary to clearly established Supreme Court precedent only if a rule that contradicts the governing law set forth in Supreme Court cases or if it confronts a set of facts that are materially distinguishable from a decision of the Court and nevertheless arrives at a different result.  *Id.* (*citing Mitchell v. Esparaza*, 124 S. Ct. 7, 10 (2003) (per curiam) (*quoting Williams v. Taylor*, 120 S. Ct. 1485, 1519-1520 (2000); *see also Bell v. Cone*, 122 S. Ct. 1843, 1850 (2002)).

10

"[W]here the state court decides a claim on the merits but does not articulate the reasons for its decision, [a federal habeas court is] 'obligated to conduct an independent review of the record and applicable law to determine whether the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented.'" *Id.* (*quoting Daniels v. Lafler,* 192 Fed. Appx. 408, 419 (6th Cir. 2006) (*quoting Harris v. Stovall,* 212 F.3d 940, 943 (6th Cir. 2000) *cert. denied*, 121 S. Ct. 1415 92001)).  "This 'independent review' is 'not a full, *de novo* review of the claims, but remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA.'"  *Id.* (*citing Harris,* 212 F.3d at 943).

## V.  PETITIONER'S POSITIONS.

In the Petition for Writ of Habeas Corpus, Petitioner asserts thirteen assignments of error:

Ground one: Petitioner's convictions were based upon insufficient evidence in relation to the offense of felonious assault.

Ground two: Whether the trial court erred [sic] by permitting other acts evidence, and in failing to give limiting instructions.

Ground three: Petitioner was denied the effective assistance of counsel when his trial counsel failed to object to the state's improper testing of a gun and ammunition other than the actual gun from the incident.

Ground four**:** Whether appellate counsel was ineffective when he failed to argue that petitioner's trial counsel was ineffective when he failed to request that the jury be given limiting instructions.

Ground five: Appellate counsel was ineffective when he failed to argue that the trial court committed a plain error when it failed to issue limiting instructions of petitioner's other acts, and prejudicial irrelevant testimony which denied the petitioner of the right to a fair trial.

Ground six: Appellate counsel was ineffective when he failed to argue that petitioner's trial counsel was ineffective when he failed to make objections to other acts testimony which thereby denied petitioner of the constitutional right to a fair trial.

Ground seven: Appellate counsel was ineffective when he failed to argue that petitioner's trial counsel was ineffective when he failed to object to prejudicial insinuations which implied that petitioner was engaged in illegal activities.

Ground eight**:** Appellate counsel was ineffective when he failed to argue that petitioner's trial counsel

11

was ineffective when he failed to object to the prosecution's reference to petitioner's right to remain silent.

Ground nine: Appellate counsel was ineffective when he failed to argue that petitioner's trial counsel was ineffective when he failed to object to the prosecution's mistatement [sic] of facts during closing arguments.

Ground ten: Appellate counsel was ineffective when he failed to argue that petitioner's trial counsel was ineffective when he failed to object to irrelevant and prejudicial testimony pertaining to the number of guns that were in the petitioner's home.

Ground eleven: Appellate counsel was ineffective when he failed to argue that petitioner's trial counsel was ineffective by failing to object to prejudicial testimony relating to an inflammatory movie rented by the petitioner.

Ground twelve: Appellate counsel was ineffective when he failed to argue that petitioner's trial counsel was ineffective when he failed to introduce exculpatory evidence (a letter written by the victim), as evidence during trial.

Ground thirteen: Appellate counsel was ineffective when he failed to argue that the cumulative effect of the errors made at trial, denied petitioner of the right to a fair trial.

## VI. RESPONDENT'S POSITION

Respondent concedes that Petitioner's first ground for relief was presented in his direct appeal and as his first proposition of law before the Ohio Supreme Court.  The merits of this claim are before the Court.

Respondent agrees that Petitioner's second through eleventh and thirteenth claims were exhausted. However, Petitioner's second through eleventh and thirteenth claims are barred from review by principles of procedural default.   Petitioner presented his twelfth habeas ground (alleging constitutionally deficient ineffective appellate counsel for failing to raise ineffective trial counsel's failure to introduce as evidence at trial an allegedly exculpatory note written by the victim) to the state trial court in his post-conviction petition. Petitioner has not yet appealed the trial court's denial of his untimely post-conviction petition.

## VII. PETITIONER'S REPLY TO RESPONDENT'S ANSWER

Petitioner asserts that he cannot demonstrate good cause for the untimely filing of his motion for post conviction relief in the trial court.  Consequently, it is unlikely that the state court would consider the merits of his twelfth claim.  Dismissal, so that he could return to the appellate court, is a futile gesture.  Instead,

12

Petitioner seeks consideration on the basis that failure to consider the claim will result in a fundamental miscarriage of justice.  Further, Petitioner states that the Court should excuse the failure to exhaust his twelfth claim as he is actually innocent of the crimes for which he was convicted.

In response to the procedural default of his second through eleventh and thirteenth claims, Petitioner contends that he was only required to present his claims of ineffective assistance of appellate counsel to the Ohio Supreme Court on direct appeal.  Thus, such clams were not procedurally defaulted.

### VIII.  THE MOTION FOR RECONSIDERATION

Petitioner seeks reconsideration of the Order denying his request for discovery pursuant to FED. R. CIV. P. 72(a).  Petitioner contends that the district court judge must modify or set aside any portion of the Magistrate Judge's non-dispositive pretrial order found clearly erroneous or contrary to law.  In this case, Petitioner states that the Magistrate Judge erred in denying Petitioner's motion for discovery and for an evidentiary hearing (Docket No. 17).

When a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge to hear and decide, the magistrate judge must promptly conduct the required proceedings and, when appropriate, issue a written order stating the decision.  FED. R. CIV. P. 72(a) (Thomson Reuters 2010).  A party may serve and file objections to the order within 14 days after being served with a copy.  FED. R. CIV. P. 72(a) (Thomson Reuters 2010).  A party may not assign as error a defect in the order not timely objected to.  FED. R. CIV. P. 72(a) (Thomson Reuters 2010).  The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.  FED. R. CIV. P. 72(a) (Thomson Reuters 2010).

Here, the District Court denied Petitioner's motion as premature and held that the District Judge would consider Petitioner's motion after the Magistrate's ruling on the habeas petition.  Consequently, Petitioner's motion will be addressed by the District Court Judge.

## VIV.  PROCEDURAL ANALYSIS.

There are two types of procedural barriers that might preclude federal review of claims in a habeas petition.  *Bays v. Warden,* 2009 WL 1617950, *2 (S. D. Ohio 2009).  The first type, procedural default, is a judicially created rule, grounded in allegiance to comity values and requiring federal courts to respect state court judgments that are based on an "independent and adequate" state procedural ground.  *Id.* (*citing Coleman v. Thompson,* 111 S.Ct. 2546, 2555 (1991); *Maupin v. Smith,* 785 F.2d 135, 138 (6th Cir.1986)).  Under the procedural default paradigm, the state court or courts reject a direct or post-conviction appeal because the defendant failed to comply with some state law or rule concerning timeliness, pleading requirements, sufficient evidence, or the like.  *Id.*

The second type of bar, exhaustion, is similarly grounded in respect for state court procedures, but it is federally mandated by AEDPA, *Id.* (*see* 28 U.S.C. § 2254(b)(1)(A), (c)), and requires petitioners to give state courts a "fair opportunity" to assess petitioners' claims.  *Id.* (*citing O'Sullivan v. Boerckel*, 119 S. Ct. 1728, 1732 (1999)).  Often, federal courts will rule that a petitioner's claim is "defaulted" because the petitioner failed to exhaust his remedies and the time for refiling an appeal in the state court has passed.  *Id.*  The unexhausted claim is then classified as "procedurally defaulted" and deemed forfeited absent a showing of cause and prejudice.  *Id.* (*see In re Cook*, 215 F.3d 606, 607-608 (6th Cir. 2000)).

### 1.  DID PETITIONER EXHAUST HIS SECOND THROUGH THIRTEENTH CLAIMS?

For purposes of habeas review, the parties concede that Petitioner's second through eleventh claims were exhausted.  Petitioner admits that he failed to satisfy the exhaustion requirements for his twelfth claim.

As a general rule, a state prisoner must exhaust all available state remedies or have no remaining state remedies available before a federal court will review a petition for a writ of habeas corpus.  *Gulley v. Hall,* 2010 WL 1438809, *5 (N. D. Ohio 2010) (*citing* 28 U.S.C. § 2254(b) and (c); *see also Baldwin v. Reese*, 124 S.Ct.

14

1347, 1349-1350 (2004); *Riggins v. McMackin*, 935 F.2d 790, 793 (6th Cir. 1991)).  If any state procedures for relief remain available, then the petitioner has not exhausted all of his state remedies.  *Id.* (*citing Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994)).  This "total exhaustion" rule prohibits a district court from proceeding to address a mixed petition so the district court has four options:  (1) stay the entire petition; (2) dismiss the entire petition without prejudice; (3) deny the entire petition on the merits, both exhausted and unexhausted claims, or (4) dismiss the unexhausted claims and proceed with the exhausted ones.  *Swanson v. DeSantis*, 606 F.3d 829, 831 (6th Cir. 2010) (*citing Harris v. Lafler*, 553 F. 3d 1028, 1031-1032 (6th Cir. 2009)).

The Magistrate finds it would be futile to stay the petition so that Petitioner can return to state court to seek Supreme Court review of the appellate decision denying his motion to vacate or set aside judgment.  On September 4, 2009, the appellate court denied Petitioner's request for relief regarding whether appellate counsel was ineffective for failure to argue that Petitioner's trial counsel was ineffective when he failed to introduce exculpatory evidence.  Petitioner's claimed right of appeal or the opportunity to seek a discretionary appeal expired 45 days later.  Such appeal would be procedurally barred.

Even if the case were dismissed without prejudice, Petitioner would be foreclosed from filing a new petition as the statute of limitations for filing has expired.  Petitioner would not be entitled to equitable tolling during this proceeding.  Equitable tolling is only provided during the pendency of state proceedings, not federal proceedings.  *See Duncan Walker*, 121 S. Ct. 2120, 2128 (2001).

Dismissing this case in its entirety would be a harsh result.  Rather, the Magistrate is persuaded that under the total exhaustion rule, there is precedent for dismissing the unexhausted claim and considering the remaining claims on their merits.  *See Jones v. Bock*, 127 S. Ct. 910, 916 (2007).  Thus, the Magistrate recommends that the Court dismiss Petitioner's twelfth claim.  Petitioner's remaining second through eleventh and thirteenth claims were exhausted and are therefore subject to review if not procedurally defaulted.

### 2.     ARE PETITIONER'S SECOND THROUGH ELEVENTH AND THIRTEENTH CLAIMS BARRED FROM

**REVIEW BY PRINCIPLES OF PROCEDURAL DEFAULT?**

Respondent contends that Petitioner's second through eleventh and thirteenth claims are barred from review by principles of procedural default.

In general, a federal court may not consider "contentions of general law which are not resolved on the merits in the state proceeding due to petitioner's failure to raise them as required by state procedure." *Smith v. Ohio Department of Rehabilitation and Correction* 331 F. Supp.2d 605, 618 -619 (N. D. Ohio 2004) (*citing Wainwright v. Sykes,* 97 S.Ct. 2497, 2506 (1977)).  If a state prisoner has defaulted his or her federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.  *Id.* (*citing Coleman, supra,* 111 S.Ct. at 2565).  In *Maupin v. Smith,* 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit outlined the analysis to be followed when a state argues that a habeas claim is defaulted because of a prisoner's failure to observe a state procedural rule:

> First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule.  Second, the federal court must determine whether the state courts actually enforced the state procedural sanction-that is, whether the state courts actually based their decisions on the procedural rule.  Third, the federal court must decide whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim.

*Id.* (*citing Williams v. Coyle,* 260 F.3d 684, 693 (6th Cir. 2001)).

In determining whether the *Maupin* factors are met, the federal court looks to the last explained state court judgment.  *Id.* (*citing Ylst v. Nunnemaker,* 111 S.Ct. 2590, 2595 (1991)).  If the last reasoned opinion on a claim explicitly imposed a procedural default, there is a presumption, which can be rebutted with strong evidence to the contrary, "that a later decision rejecting the claim did not silently disregard the bar and consider

16

the merits." *Id.* (*citing Ylst*, 111 S. Ct. at 2594).  "If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review." *Id.* (*citing Ylst*, 111 S.Ct. at 2593).

If the three *Maupin* factors are met, the claim is procedurally defaulted. *Id.* The federal court can excuse the default and consider the claim on the merits only if the petitioner demonstrates that (1) there was cause for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error or (2) a fundamental miscarriage of justice would result from a bar on federal review. *Id.* (*citing Maupin, supra*, 785 F.2d at 138; *Hutchison v. Bell,* 303 F.3d 720, 735 (6th Cir. 2002); *Combs,* 205 F.3d 269, 274-275 (6th Cir. 2000)).

A petitioner can establish cause in two ways. *Id.* First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the state's procedural rule." *Id.* at 618-619 (*citing Murray v. Carrier,* 106 S.Ct. 2639, 2645 (1986); *Mohn v. Bock,* 208 F. Supp.2d 796, 801 (E. D. Mich. 2002)).  Objective impediments include that the factual or legal basis for a claim was not reasonably available to counsel or that interference by officials made compliance impracticable. *Id.* (*citing Murray, supra*, 106 S.Ct. at 2645; *Mohn, supra,* 208 F. Supp.2d at 801).  Second, constitutionally ineffective assistance of counsel constitutes cause. *Id.* (*citing Murray, supra*, 106 S.Ct. at 2645-2646; *Mohn*, *supra*, 208 F. Supp.2d at 801, 804; *Rust, supra,* 17 F.3d at 161).

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Id.* (*citing Perkins v. LeCureux,* 58 F.3d 214, 219 (6th Cir. 1995) (*quoting United States v. Frady,* 102 S.Ct. 1584, 1595 (1982)).  "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Id.* (*citing Simpson v. Jones,* 238 F.3d 399, 409 (6th Cir. 2000)).

Petitioner's second claim was presented to both the appellate and Supreme Court of Ohio.  Thus it is not procedurally defaulted.  Petitioner's third through eleventh claims were presented directly to the Supreme

17

Court of Ohio.  Claims of ineffective assistance of appellate counsel can be raised on an application for reconsideration in the court of appeals or in a direct appeal to the Supreme Court.  *State v. Davis*, 119 Ohio St. 3d 422, 424-215, 894 N. E. 2d 1221, 1223 (2008).  In this case, Petitioner presented these claims on direct appeal to the Supreme Court.  These claims have been adequately preserved for habeas review.

### X. SUBSTANTIVE ANALYSIS.

The Magistrate finds that Petitioner exhausted and did not procedurally default his first, second, third, fourth, fifth, sixth, seventh, eighth, ninth, tenth and thirteenth claims.  The review of the merits of each claim follows.

### 1.   THE MERITS OF GROUND ONE - SUFFICIENCY OF EVIDENCE

The parties agree that Petitioner's challenge of the sufficiency of the evidence supporting his conviction was presented to the appellate and Ohio Supreme Courts.  Under Section 2254(d), Petitioner must establish that the result reached by the state court in affirming his conviction was contrary to clearly established federal law or resulted in a the court's unreasonable determination of the facts and evidence presented at trial.  A claim of insufficient evidence that rises to the level of a constitutional due process violation will require a finding that no rational trier of fact could have found Petitioner guilty beyond a reasonable doubt of the essential elements of the felonious assault and firearm specification charges.

On habeas corpus review, the federal court conducts an independent review of the state court record in analyzing petitioner's sufficiency of the evidence claim.  *Ob'Saint v. Warden, Toledo Correctional Institution*, 675 F. Supp.2d 827, 838 (S. D. Ohio 2009) (*citing Nash v. Eberlin*, 437 F.3d 519, 525 (6th Cir. 2006).  However, the Court "does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court."  *Id*. at 838-839 (*ciitng Matthews v. Abramajtys,* 319 F.3d 780, 788 (6th Cir. 2003) (*citing Marshall v. Lonberger,* 103 S.Ct. 843, 850 (1983)).  "*Jackson* makes clear that 'a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume-even if

it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.' " *Id.* (*citing O'Hara v. Brigano,* 499 F.3d 492, 499 (6th Cir. 2007) (*citing Jackson v. Virginia,* 99 S.Ct. 2781, 2792-2793 (1979)).  In addition, circumstantial evidence may be sufficient to support a conviction and such evidence need not remove every reasonable hypothesis except that of guilt.  *See Jackson, supra*, 99 S. Ct. At 2792-2793; *Walker v. Russell,* 57 F.3d 472, 475 (6th Cir. 1995); *Jamison v. Collins,* 100 F. Supp.2d 647, 705 (S. D. Ohio 2000), *aff'd,* 291 F.3d 0 (6th Cir.2002).  "The mere existence of sufficient evidence to convict therefore defeats a petitioner's claim."  *Id.* (*citing Matthews, supra*, 319 F.3d at 788).

There was a plethora of evidence presented at trial to support a conviction for felonious assault with a firearm specification[6].  At the time of the assault, Linda Weaver admitted that she dropped a pizza box on the floor and dismantled an audio system to incite a reaction from Petitioner.  Petitioner reacted by pushing her.  Ms. Weaver fell and somehow made her way to the couch.  From the adjacent table, Ms. Weaver retrieved a .45 automatic firearm  and pointed it toward Petitioner.  Petitioner approached Ms. Weaver and grabbed the firearm.  He then pinned her on the couch, placing his knee in Ms. Weaver's torso.  During the struggle, the safety on the gun became disengaged and Ms. Weaver was wounded in the right fourth intercostal space.  Petitioner's father testified that Petitioner told him that while struggling over the gun, it discharged.  Dr. Robert Marley, the treating physician at Akron General Medical Center, testified that the gunshot wound carried with it a substantial risk of death (Docket No. 9, Volume II, pp. 39 of 190 to 54 of 190, 87 of 190, 88 of 190, 91 of 190, 92 of 190, 94 of 190; Docket No. 9, Volume IV, pp. 11 of 163, 34 of 163, 54 of 163, 112 of 163, 114 of 163, 117 of 163;. Docket No. 9, Volume 4, p. 17 of 163).

---

[6]

Under OHIO REV. CODE § 2903.11(A)(1), no person shall knowingly cause serious physical harm to another.  OHIO REV. CODE § 2901.22(B) provides that a person acts knowingly, regardless of purpose, when he or she is aware that this conduct will probably cause a certain result or will probably be of a certain nature.

Petitioner's first ground for relief is defeated by the mere existence of sufficient evidence that, regardless of his motive, Petitioner reacted and caused serious physical harm to Ms. Weaver.  The Magistrate recommends that the Court deny habeas relief on the basis of relief requested in ground one.

2.      THE MERITS OF GROUND TWO - OTHER ACTS EVIDENCE

During her testimony, Ms. Weaver related events in which Petitioner's acts were in conformity with a propensity for violence.  On one occasion, Petitioner sprayed Ms. Weaver with a water hose.  When she sprayed him, Petitioner lifted her over his head and threw Ms. Weaver on the concrete.  On another occasion, Ms. Weaver insisted that Petitioner listen to her.  Petitioner responded by taking her by the throat and holding her against the wall (Docket No. 9, Exhibit II, p. 33 of 190, 34 of 190 to 35 of 190).  Petitioner believes that this testimony does not comply with one of the exceptions to the general prohibition of other acts evidence under OHIO R. EVID. 404(B).  Petitioner contends that the trial court erred by permitting the admission of other acts testimony and failing to give limiting instructions to the jury on the purpose of other acts testimony.

Evidence of wrongs or acts is not admissible to prove the character of a person in order to show conformity therewith.  OHIO R. EVID. 404(B) (Thomson Reuters 2010).  Evidence of wrongs or acts may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identify or absence of mistake or accident.  OHIO R. EVID. 404(B) (Thomson Reuters 2010).  Generally, prior bad acts by a defendant against the same victim are admissible in domestic violence cases to prove the defendant's intent, motive, and/or absence of mistake or accident.  *State v. Clay*, 181 Ohio App. 3d 563, 573, 910 N. E. 2d 14, 21 (2009) (*citing State v. Blonski*, 125 Ohio App. 3d 103, 113, 707 N. E. 2d 1168 (1997); *State v. Johnson*, 73 Ohio Misc. 2d 1, 3, 657 N. E. 2d 383 (1994)).

When using a defendant's prior acts to show his intent, "the offense for which the defendant is being tried and the other act must have occurred reasonably near to each other and a similar scheme, plan or system must have been utilized to commit the offense at issue and the other offenses."  *Id.* (*citing Blonski*, *supra*, at 113,

20

707 N.E.2d 1168).

The evidence of Petitioner's acts during altercations between Petitioner and Ms. Weaver that preceded the trial, tended to show the elements of the domestic violence charge.  The trial court judge did not abuse her discretion in admitting this evidence or failing to give a limiting instruction about its admissibility.

### 3. THE MERITS OF GROUND THREE - INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner contends that his guilt was established, in part, on the gun ballistics.  Specifically, the proximity of the gun in relation to Ms. Weaver's physical wounds at the moment of entry was crucial to Petitioner's defense.  Here, an expert witness introduced evidence adduced from simulated firing of a gun and ammunition that was not used in this case.  Petitioner alleges that he was denied the effective assistance of counsel when his trial counsel failed to object to the testimony of the state's expert witness allegedly  based upon improper testing of a gun and ammunition.

The familiar two-prong test set forth in *Strickland v. Washington,* 104 S.Ct. 2052 (1984), governs the analysis of whether counsel's failure to object to the admission of the expert witness' testimony constituted deficient representation.  The first prong requires that the petitioner prove that his or her trial counsel's representation was deficient in that it "fell below an objective standard of reasonableness." *Towns v. Smith,* 395 F.3d 251, 258 (6th Cir. 2005) (citing Strickland, supra, 104 S. Ct. at 2064-2065).  The Court in *Strickland* opined that "We must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged conduct might be considered sound trial strategy."  *Id.* (*citing Strickland*, 104 S. Ct. at 2065). The second prong requires the petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of [his trial] would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (*citing Strickland,* 104 S. Ct. at 2068. "Both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and

fact entitled to de novo review." *Id.* (*citing Combs v. Coyle,* 205 F.3d 269, 278 (6th Cir. 2000)).

The standard for determining the admissibility of expert testimony is set forth in OHIO R. EVID. 702. Expert testimony is admissible if (1) it relates to other matters beyond the knowledge of experience possessed by lay persons or dispels a misconception common among lay persons, (2) the witness is qualified as an expert by specialized knowledge, skill, experience, training or education, and (3) the witness' testimony is based on reliable, scientific, technical or other specialized information. OHIO R. EVID. 702(A), (B), (C) (Thomson Reuters 2010). Experts can testify as to the possibility rather than the probability and that such testimony becomes an issue of sufficiency and not admissibility. *State D'Ambrosio* 67 Ohio St.3d 185, 191, 616 N.E.2d 909-915 (1993).

Here, Officer Davis' testimony was admissible under OHIO R. EVID. 702(C). The comparisons he made between the statements made by Petitioner, the medical reports and the ballistic residue evidence were instrumental in showing that Ms. Weaver's wound was not self inflicted. Considering a strong presumption that counsel's conduct fell within a wide range of reasonable professional assistance, the Magistrate must consider that trial counsel effectively cross-examined Officer Davis who admitted that during a struggle, the strength and tightening of hands on a weapon could result in an accidental discharge (Docket No. 9, Volume 3, p. 61 of 171). The jury was instructed to decide what weight to give this testimony (Docket No. 9, Volume 5, p. 9 of 91).

### 4.    PETITIONER'S CLAIMS OF INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL ALLEGED IN GROUNDS FOUR THROUGH ELEVEN AND THIRTEEN.

Grounds four through eleven and thirteen, all alleging violations of the professional standards for appellate counsel, were submitted to the Ohio Supreme Court on direct appeal.

It is well established that in order to establish a Sixth Amendment violation, it must be shown both that counsel's representation fell below an objective standard of reasonableness and his deficiencies prejudiced the defendant. *Strickland, supra*, 104 S. Ct. at 2070. Counsel's unreasonable conduct prejudices a petitioner if a

reasonable probability exists that but for such conduct, the outcome of the proceedings would have been different. *Id.* at 2068.

In *Mapes v. Coyle,* 171 F.3d 408 (6th Cir. 1999), the Sixth Circuit provided guidance on considerations relevant to claims of ineffective assistance of **appellate counsel**. Cases considered by the court on the issue of ineffective assistance of appellate counsel suggest that the following considerations should to be taken into account in determining whether an attorney on direct appeal performed reasonably competently.

(1)    Were the omitted issues "significant and obvious"?

(2)    Was there arguably contrary authority on the omitted issues?

(3)    Were the omitted issues clearly stronger than those presented?

(4)    Were the omitted issues objected to at trial?

(5)    Were the trial court's rulings subject to deference on appeal?

(6)    Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?

(7)    What was appellate counsel's level of experience and expertise?

(8)    Did the petitioner and appellate counsel meet and go over possible issues?

(9)    Is there evidence that counsel reviewed all the facts?

(10)    Were the omitted issues dealt with in other assignments of error?

(11)    Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Martin v. Mitchell,* 280 F.3d 594, 605 (6th Cir. 2002) (*citing Mapes*, 171 F. 3d at 427-428).

a.    THE MERITS OF GROUND FOUR.

In ground four, Petitioner asserts that appellate counsel was deficient for failing to object to trial counsel's failure to request a limiting instruction informing the jury not to place undue emphasis on his prior acts of violence.

23

When considering whether counsel's representation amounts to a deficient performance, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  *Strickland, supra*, 104 S. Ct. at 2064.  The defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *Id.*  Appellate courts must refrain from second guessing strategic decisions counsel make at trial, even where counsel's trial strategy was questionable. *Id.*

Here, Petitioner has failed to show that his trial attorney did not provide adequate representation in allowing, without objection, the admission of prior acts.  Ms. Weavers' testimony of Petitioner's prior bad acts against her by Petitioner was admissible to show an element of the domestic violence charge.  Trial counsel did not object as such testimony was admissible because it was a proper consideration of other acts evidence and he may not have wanted to draw any additional attention to the other acts testimony.  Indulging the strong presumption that trial counsel followed a reasonable strategy, the Magistrate cannot find that appellate counsel's failure to challenge trial counsel's failure amounts to a deficient performance.

### b.    THE MERITS OF GROUND FIVE - FAILURE TO REQUEST LIMITING INSTRUCTIONS

In ground five, Petitioner argues that appellate counsel's performance was ineffective when he failed to argue that the trial court committed a plain error when it failed to issue limiting instructions of petitioner's other acts, and prejudicial irrelevant testimony which denied the petitioner of the right to a fair trial.

OHIO CRIM. R. 52 governs plain error, stating that plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.  Under Ohio law, plain error does not exist unless, but for the error, the outcome of the trial would have been different. *State v. Byrd*, 2009 WL 975773, *3 (2009).  Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* (*citing State v. Haney,* 2006 WL 2106173, 2006-Ohio-3899, ¶ 50 (2006) (*quoting State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph

three of the syllabus (1978)).

Petitioner's plain error argument does not apply because the court would have denied a request to give a limiting instruction for consideration of admissible evidence. Even without this evidence, the outcome would have been the same. There was other evidence sufficient to convict Petitioner. Appellate counsel's failure to raise this issue on direct appeal does not fall below the objective standard of reasonableness.

    **c**.     **THE MERITS OF GROUND SIX - FAILURE TO OBJECT TO OTHER ACTS TESTIMONY**

Ground six suggests that appellate counsel was ineffective when he failed to argue that trial counsel was ineffective when he failed to make objections to other acts testimony which thereby denied petitioner of the constitutional right to a fair trial.

This ground is in effect, a reiteration of ground two. For the reasons previously stated, the Magistrate recommends that the Court deny this claim.

    **d**.     **THE MERITS OF GROUNDS SEVEN AND TEN - INEFFECTIVENESS OF APPELLATE COUNSEL**

In ground seven, Petitioner alleges that appellate counsel was ineffective when he failed to argue that trial counsel was ineffective when trial counsel failed to object to prejudicial insinuations made by Ms. Weaver which implied that Petitioner was engaged in illegal activities. In the second part of ground ten, Petitioner claims that appellate counsel was ineffective when he failed to argue that trial counsel was ineffective for failure to object to Ms. Weaver's testimony that he shot at animals.

Ms. Weaver's testified:

A. I spoke with his dad (Petitioner's dad) on the phone. I called his dad, and I asked his dad if he was–if he knew where he was at, in which case his dad replied–his dad said, he must be at work like he normally is. Well, he–his dad knew what he does and his dad didn't think he was at work because his dad knows.

(Docket No. 9, Volume II, p. 107).

Q.  What about BB guns?

A.  Well, they are either kept by the front door or in the –his bedroom.  He'll see stray animals and shoot at them.

(Docket No. 9, Volume II, p. 63).

The Magistrate presumes that the failure to object to this testimony or explore the ideas or facts exposed in such testimony upon cross-examination was a strategic measure designed to close the door on questioning which may have been prejudicial.  Even if the Magistrate finds deficient performance in trial counsel's failure to object to this response, the alleged deficiency does not rise to the level of ineffective assistance of counsel since the probable difference in the trial's result cannot be established from the ambiguous inferences made by Ms. Weaver.  Since trial counsel's response to the testimony did not fall below the objective standard of reasonableness, appellate counsel's failure to object to trial counsel's failure does not constitute ineffective assistance of counsel.

e.    **THE MERITS OF GROUND EIGHT - PROSECUTOR'S REFERENCE TO DEFENDANT'S RIGHT OF SILENCE**

Petitioner contends that appellate counsel was ineffective when he failed to argue that trial counsel was ineffective for his failure to object to the prosecution's reference to Petitioner's right to remain silent.  Specifically, the prosecutor elicited testimony which violated Petitioner's right to remain silent and/or cease communication as follows:

Ms. Wypasek:                      And that was the end of his statement?

Det. Shaeffer:          Yes

Ms. Wypasek:                      And he did not wish to elaborate further?

Det. Shaeffer:          No.

(Docket No. 9, Volume II, p. 201 at 18).

Petitioner argues that the reference to his silence could not have been more clear.  The testimony was

26

prejudicial as it raised an adverse inference of guilt as Petitioner testified in his own defense and denied he had committed the offenses for which he stood trial.

The Fifth Amendment may be asserted by a suspect who is questioned during the investigation of a crime. *Girts v. Yanai*, 501 F.3d 743, 758 (6th Cir. 2007) (*quoting Coppola v. Powell,* 878 F.2d 1562, 1565 (1st Cir.1989)); *see also Wainwright v. Greenfield,* 106 S.Ct. 634, 640 n. 13 (1986) (finding that "silence does not mean only muteness; it includes the statement of a desire to remain silent as well as of a desire to remain silent until an attorney has been consulted").  The Court indicated that "[i]n a pre-arrest setting as well as in a post-arrest setting, it is clear that a potential defendant's comments could provide damaging evidence that might be used in a criminal prosecution."  *Id.* (*citing Combs,* 205 F.3d at 283).  As in *Combs,* in the instant case, "the use of a defendant's pre-arrest silence as substantive evidence of guilt violates the Fifth Amendment's privilege against self-incrimination." *Id.* (*see also Ohio v. Leach,* 102 Ohio St.3d 135, 807 N.E.2d 335, 340-41 (2004) (holding "that the use of [defendant's] pre-arrest silence in the state's case-in-chief as *substantive* evidence of guilt subverts the policies behind the Fifth Amendment") (emphasis in original).

Petitioner and his lawyer appeared at the APD where Petitioner made a voluntary statement to Officer Schaeffer in which he admitted that he had an argument with Ms. Weaver regarding money, the gun was accidentally discharged, he took Ms. Weaver to the hospital, dropped her off and returned home to secure his house.  There is no impermissible inference to a violation of the privilege against self incrimination after Petitioner waived his right to remain silent and provided substantive evidence of his own guilt in the statement to Officer Schaeffer (Docket No. 9, Volume 2, p. 201).  The prosecutor's inquiry was directed at Petitioner's refusal to disseminate other information, not his right to remain silent.

The Magistrate finds that the prosecutor did not manifest an intent to comment upon Petitioner's silence or his right to remain silent.  The prosecutor manifested an intent to show that Petitioner's statement had been concluded.  Consequently, trial counsel's failure to object did not infect the trial with error of a constitutional

dimension. Appellate counsel's failure to object to trial counsel's failure to object did not rise to the level of misconduct.

**f.** **THE MERITS OF GROUND NINE-PROSECUTOR'S CLOSING ARGUMENT**

Petitioner argues that appellate counsel was ineffective when he failed to argue that trial counsel was ineffective for failing to object to the prosecution's misstatement of facts during closing arguments. Officer Sutton testified that Petitioner's dogs were "in the fence". Petitioner testified there was no fence around his yard. This line of questioning by the prosecutor placed Petitioner in an unfavorable light, characterizing him as an untruthful person with respect to the fence issue.

A prosecutor is entitled to a certain degree of latitude in closing arguments. *Rice v. Moore* 633 F. Supp.2d 541, 564 (S. D. Ohio 2008) (*citing State v. Liberatore*, 69 Ohio St.2d 583, 589, 433 N.E.2d 561 (1982)). Thus, it falls within the sound discretion of the trial court to determine the propriety of these arguments. *Id.* (*citing State v. Maurer*, 15 Ohio St.3d 239, 269, 473 N.E.2d 768 (1984)). A conviction will be reversed only where it is clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would not have found the defendant guilty. *Id.* (*citing State v. Benge,* 75 Ohio St.3d 136, 141, 661 N.E.2d 1019, 1996-Ohio-227. So, to prevail on a claim of prosecutorial misconduct, a habeas petitioner must demonstrate that the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (*citing Donnelly v. DeChristoforo,* 94 S.Ct. 1868, 1871 (1974)). "Even if the prosecutor's conduct was 'undesirable or even universally condemned,' this Court can only provide relief if the [conduct was] so egregious as to render the entire trial fundamentally unfair to a degree tantamount to a due process violation." *Darden v. Wainwright,* 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). The reviewing court's focus in a claim of prosecutorial misconduct is "the fairness of the trial, not the culpability of the prosecutor." *Id.* (*citing Smith v. Phillips,* 102 S.Ct. 940, 947 (1982)). A prosecutor's alleged misconduct must be examined within the context of the entire trial to determine whether it deprived a defendant of a fair trial. *Id.* (*citing United States v. Young,*

28

105 S.Ct. 1038, 1044-1045 (1985)).  "Reversal is required only if the prosecutor's misconduct is 'so pronounced and persistent that it permeates the entire atmosphere of the trial or so gross as probably to prejudice the defendant.' " *Id.* (*citing Lundgren v. Mitchell,* 440 F.3d 754, 778 (6th Cir. 2006) (quoting *Pritchett v. Pitcher,* 117 F.3d 959, 964 (6th Cir. 1997)).

Officer Sutton testified that Petitioner told him that he had a fenced-in yard.  Petitioner testified that he did not have a fence (Docket No. 9, Volume IV, p. 466).  The prosecutor stated in her closing argument that Petitioner did not have a fence (Docket No. 9, Volume V, p. 587).  In the context of the entire trial, it is unlikely that a jury would have voted to acquit Petitioner absent this comment.  The Magistrate is not persuaded that appellate counsel's failure to argue that trial counsel was ineffective for failing to object to the prosecution's misstatement of facts during closing arguments constitutes deficient representation.

**g.  MERITS OF GROUND TEN-FAILURE TO OBJECT TO GUN TESTIMONY**

Petitioner asserts a claim that appellate counsel was ineffective when he failed to argue that trial counsel was ineffective when he failed to object to irrelevant and prejudicial testimony obtained during cross-examination that pertained to the number of guns in Petitioner's home.

A criminal defendant who voluntarily takes the stand in his or her own defense voluntarily subjects himself or herself to proper cross-examination.  *State v. Roten*, 149 Ohio App. 3d 182, 186, 776 N. E. 2d 551, 553 (2002) (*citing State v. Jcocks*, 64 Ohio App. 3d 713, 717-718, 582 N. E. 2d 1079 (1990)).  A defendant who chooses to testify waives his or her privilege against compulsory self-incrimination with respect to the testimony he or she gives.  *Id.* (*citing Harrison v. United States*, 88 S. Ct. 2008, 2010 (1968)).

Evidence of other acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith.  OHIO R. EVID.  404(B) (Thomson Reuters 2010).  It may, however, be admissible for purposes of showing knowledge or absence of mistake or accident.  OHIO R. EVID.  404(B)

(Thomson Reuters 2010).

Petitioner chose to subject himself to inquiry about the number of guns he possessed by agreeing to testify.  The prosecutor solicited his testimony to show Petitioner's knowledge of firearms and that he was unlikely to err in disengaging the safety.  However, the prosecutor also gave Petitioner an opportunity during cross-examination to explain that when he moved into the neighborhood, it was plagued with urban blight.  For his safety, he possessed three firearms, two dogs and a security camera.  Further, he had posted signs on his property that discouraged intruders.  Although he subsequently became acquainted with his neighbors, he maintained the equipment, including the guns, to preserve his safety and the safety of his property (Docket No. 9, Volume IV, pp. 492-494).

Even if Petitioner's testimony were to be construed against the strict standard for determining admissibility, such testimony was admissible evidence under OHIO R. EVID. 404(B).  The Magistrate does not find that trial counsel's failure to object to admissible evidence fell outside the wide range of reasonable professional assistance.

      h.      MERITS OF GROUND ELEVEN-MOVIE RENTAL TESTIMONY

In this assignment of error, Petitioner contends that appellate counsel was ineffective when he failed to argue that petitioner's trial counsel was ineffective by failing to object to prejudicial testimony relating to an inflammatory movie rented by Petitioner.

Ohio has recognized that distinction by admitting evidence of habit to establish the same conduct under like circumstances on the occasion in issue, while excluding evidence of a general disposition toward the conduct in issue.  *State v. Reed,* 110 Ohio App.3d 749, 753, 675 N.E.2d 77, 79 (1996) (*see* EVID. R. 404(A) and *State v. Hohman*, 81 Ohio App.3d 80, 83, 610 N.E.2d 473, 475 (1991)).  Character evidence relates to a general trait such as honesty, temperance or peacefulness.  *Id.*  Character evidence is normally inadmissible under Evid. R. 404(A).  Habit is much more specific than character.  *Id.*  It describes one's regular response to a repeated

factually specific situation.  *Id.*  It is a person's regular practice of meeting a particular kind of situation with a specific kind of conduct, such as the habit of going down a particular stairway two steps at a time.  *Id.*  The limits of OHIO R. EVID. 406 include the admission of evidence of the habit of a person, regardless of the presence of an eyewitness.  This testimony is relevant to prove that the conduct of the person was in conformity with a habit or routine practice.  OHIO R. EVID. 406 (Thomson Reuters 2010).

The testimony about the inflammatory movie was offered to establish a foundation for testimony about Petitioner's apparent repeated response to a specific situation (Docket No. 9, Volume II, p. 232-234).  Such testimony was admissible.  The Magistrate is not persuaded that trial counsel's failure to object to admissible testimony was reasonable.  Thus, appellate counsel's failure to object to trial counsel's failure to object to admissible testimony is consistent with prevailing standards that a competent appellate counsel would adopt.

i.      **MERITS OF GROUND THIRTEEN-CUMULATIVE TRIAL ERRORS**

Petitioner claims that appellate counsel was ineffective when he failed to argue the cumulative effect of the errors made at trial.

Under the doctrine of cumulative error, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal."  *State v. Leach,* 150 Ohio App.3d 567, 586, 782 N.E.2d 631, 646 (2002) (*citing State v. Garner*, 74 Ohio St. 3d 49, 64, 656 N. E. 2d 623 (1995)).  The doctrine of cumulative error is inapplicable where there are not multiple instances of harmless error.  *Id.*  Error is harmless if there is no reasonable possibility that the evidence may have contributed to the accused's conviction.  *Id.*  In such cases there must be overwhelming evidence of the accused's guilt or some other indicia that the error did not contribute to the conviction.  *Id.* (*citing State v. Echols*, 128 Ohio App. 3d 677, 716 N. E. 2d 728 (1998), (*quoting State v. DeMarco*, 31 Ohio St. 3d 191, 195 509 N. E. 2d 1256 (1987)).

Under  Sixth Circuit precedent, claims of cumulative error are not cognizable in a habeas proceeding.

*Rafferty v.Hudson*, 2009 WL 2151832, * 8 (N. D. Ohio 2009) (*citing Williams v. Anderson*, 460 F. 3d 789, 816 (6th Cir. 2006) (*citing Moore v. Parker*, 425 F. 3d 250, 256 (6th Cir. 2005)).  Not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief.  *Id.* (*citing Moore v. Parker,* 425 F. 3d at 256).

There are not multiple instances of harmless error made in the trial court.  The appellate court could not support such a claim in the court of appeals.  In any event, Petitioner could not obtain the relief requested in this district court as a claim for cumulative error is not cognizable in this habeas proceeding.

## XI. CONCLUSION

For these reasons, the Magistrate recommends that the Court deny the Petition for Writ of Habeas Corpus and deny the Motion for Reconsideration.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Dated:  October 12, 2010

## XII. NOTICE FOR REVIEW

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, as amended on December 1, 2009, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen

days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals condition the right of appeal on the filing of timely objections to a report and recommendation.